GOODYEAR TIRE & RUBBER CO. et al. v. RUBBER TIRE WHEEL CO.
et al.

(Circuit Court of Appeals, Sixth Circuit.   May 6, 1902.)

No. 1,071.

**1. PATENTS—INVENTION—COMBINATION OF OLD ELEMENTS.**
   A combination which is not only of old parts, but of old results, without the addition of any new or distinct function, is not patentable. To constitute invention, such combination of old parts must either produce a new article of manufacture, or a new machine having a distinct character of functions, or a new result must have been obtained, in an old one, which is due to the joint and co-operating action of all the elements.

**2. SAME.**
   That an aggregation of parts, taken separately from old devices, produces a device which as a whole is more serviceable or durable than those of the old art, does not render it a patentable combination where no new result of operation is attained by the co-operation of the parts in their new relations.

**3. SAME—UNDISCLOSED FUNCTIONS.**
   In order to entitle a patentee to the benefit of a new function claimed to result from his new combination of old elements, but which is not disclosed by his patent, for the purpose of attributing invention to his combination, such function must be one plainly inherent in the combination, and which necessarily results when the device is constructed as taught by the patent, and not one which arises only from a particular manner of construction, which is not pointed out, nor required for the accomplishment of any result which is claimed.

**4. SAME—GENERAL USE.**
   The general use of a patented article is evidence of value only when the novelty or utility of the article is a matter of great doubt, and its evidential value even in such cases is nothing upon the question of novelty when it can be attributed to other causes.

**5. SAME—RUBBER TIRE WHEELS.**
   The Grant patent, No. 554,675, for a rubber tire wheel, is void for lack of patentable invention, being merely a combination of old elements selected from devices of the prior art, resulting in no new mode of operation, and in which the parts perform only the old functions in substantially the old manner.

Appeal from the Circuit Court of the United States for the Northern District of Ohio.

This is a bill to restrain infringement of letters patent No. 554,-675, issued February 18, 1896, to Arthur W. Grant, for improvements in rubber tire wheels. The claims of the patent are as follows:

"(1) A vehicle wheel having a metallic rim with angularly projecting flanges to form a channel or groove with tapered or inclined sides, a rubber tire, the inner portion of which is adapted to fit in said groove or channel, and the outer portion having sides at an angle to the inner portion, the angle or corner between the outer and inner portions being located within the outer periphery of the flanges, and independent retaining wires passing entirely through the inner portions of said tire, and also within the outer peripheries of the flanges, substantially as described.

"(2) A vehicle wheel having a metallic rim with outwardly projecting flanges at an angle to the plane of said wheel so as to form a channel or groove having tapered or inclined sides, a rubber tire, the inner portion of which is adapted to fit in said tapered groove or channel, and the outer or exposed portions formed at an angle thereto, the angle or corner between the said portions being placed within the outer periphery of said flanges, openings extending entirely through the unexposed portion of said tire, and independent retaining wires in said openings, and a reinforcing strip of fibrous material placed at the bottom of said tire and wholly within said flanges, substantially as specified."

Figures 2 and 4 of the drawings of the patent are set out below.

Figure 2 is a sectional elevation of the wheel rim, shown partly in perspective. Figure 4 is a transverse sectional view of the rubber tire in detail. The specifications of the patent are as follows:

"In constructing my improved rubber tire, I take an ordinary vehicle-wheel, preferably with a plain wooden felly, a, and to this wooden felly, a, I secure a metallic rim, b, having at its edges outwardly projecting flanges, b'. These flanges, b', extend outwardly from the rim, b, at an angle, so as to form a groove or channel having tapered or beveled sides, with the bottom of said groove or channel smaller in cross section than the top. In this groove or channel I place a rubber tire, c, which is of peculiar shape. This rubber tire is formed preferably of a single piece, but not continuous. It is provided throughout its length with openings, c' c', through which are passed retaining wires, d. These retaining wires are separate and independent, and extend entirely through the openings, c', and the ends of each of said retaining wires are united together after the rubber has been compressed endwise on said wires, thus forming two independent and continuous retaining wires within the rubber tire, the ends of which, by reason of the compression, are brought together so as to entirely cover the wires and the united ends thereof. The tire proper, c, is formed of substantially the same depth as width. The outer periphery, however, is formed on the arc of a circle of much smaller diameter than the width of the rim, the-

exposed sides of the tire being formed preferably on the lines $c^2$ at an angle to each other, and also to the flanges b' of the wheel rim. The un-exposed portion of the tire, or that portion which is inclosed within the rim, is formed of substantially the same shape as the inner channel of the rim—that is to say, it is tapered from the outside inwardly—so that the sides of the inner or unexposed portion of the tire are also formed on the lines $c^3$, forming, with the lines $c^2$, an obtuse angle. The lines $c^3$, however, are less in length than the inside of the flanges b', so that the angle or corner, $c^4$, between the sides $c^2$ and $c^3$, falls below the outer periphery of the flanges b' and within the channel between said flanges. The openings c', through which the retaining wires pass, are also formed within the inner or unexposed portion of the tire—that is to say, the tops of the openings are substantially on a line with the angle or corner, $c^4$, so that the tops of said openings stand below the outer periphery of the flanges b'. The bottom portion of the tire is reinforced with a canvas strip, $c^5$, which covers the entire bottom, and may project slightly along the sides $c^3$, but does not in any case extend up as far as the angle or corner $c^4$. The tire has been described thus minutely because the constructions described are important. By having the sides of the exposed and unexposed portion of the tire formed inclined and at an angle to each other, as described, the compression of the tire in use is such that all portions of the rubber are retained within the channel or groove, and no portion of the rubber is forced over the side of the flange, which would result in cutting or grooving the tire at the corner or angle, which would eventually cause the tire to break from this point inwardly to the opening c'. The reinforcing of the bottom of the tire by the canvas strip, which may be formed into the rubber, is desirable, as it has a tendency to prevent the breaking of the rubber below that portion of the tire which is between the retaining wires and the rim. At the same time, by having the canvas strip wholly within the rim, all danger of stripping the edge of the canvas from the rubber, which would eventually result in a fracture of the rubber to the opening c', is prevented."

The defenses most relied upon are anticipation, want of patentable invention and noninfringement. The decree was for the complainants.

H. A. Toulmin and Edmund Wetmore, for appellants.
Paul A. Staley, John R. Bennett, and Border Bowman, for appellees.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

The subject of the controversy is the simple one of solid rubber tires for vehicles. When Grant entered the field as an inventor of rubber tires, he found it occupied by an army of patentees who had preceded him, and no less than 80 prior patents have been put in evidence as anticipations or as illustrations of the history of the art. Grant, in part, seems to recognize the crowded character of the field open to him, for he concludes an account of his construction by claiming that, by his mode of construction, he has produced "a rubber tired wheel rim which is capable of more use and which will remain in position better than any other tire which has ever been put upon the market."

The first claim of the Grant patent is for a combination of three elements: First. A metallic channel rim, having angularly projecting flanges, shown as b' in Fig. 2, forming a channel with inclining sides, into which the rubber fits. Second. A solid rubber tire having an inner portion adapted to fit in the channel rim and an outer

portion forming an angle or corner with the inner portion, the corner being somewhat below the top of the channel seat or metallic rim. Third. Independent retaining wires passing entirely through the rubber tires horizontally, and located below the outer periphery of the flaring sides of the channel seat. The drawings heretofore set out will better explain these parts, especially if examined in the light of the description of the patent also fully set out. The second claim is like the first, but adds a reinforcing strip of canvas across the bottom of the rubber tire.

Metal channel tire seats in great variety of form appear in the earlier patents. In some the sides of the metal channel incline inwards, and thus aid in holding the tire in place, and this method characterizes a class of rubber tired wheels, where retaining bands or wires were not used, as "clincher" tires. In others the sides of the channel rim are perpendicular; in others there were ribs or projections on the inside of such channel sides which served to assist in holding the tire in its seat. In still others the sides are shown to flare outwards to a greater or less degree, as in Grant's. The exposed portion of a rubber tire is liable to lateral expansion under compression from use, and to project over the sides of a metal channel or tire seat, and to be sheared or cut by such contact. Two ways of avoiding this kind of injurious cutting were taught in the old art, and in some cases both methods were combined. One obvious method was to round the edges of such rims. Another was to make the edges flaring; thus affording a space between the flaring side and the rubber tire into which the expanded tire might crowd itself without projecting over the edge of the metal seat. Methods for preventing such flaring effects appear very early in the art. Thus, in the English patent of 1884 to Clark, he says he forms his tire seat with "straight parallel sides slightly widened out at the mouth." In the United States patent to Owen of 1887, he recognized this cutting from lateral expansion under compression, and shows two or more forms of metal channel in which the edges of the rim are flaring at the top. To further guard against the trouble, he, after referring to this expansion under compression, says in his specifications:

"I reduce the width of the tire outside of the rim or felly, making it either of a flat or concave form, or of other form falling within the semicircle, so that when subjected to pressure the lateral expansion or enlargement will not cause the tire to project beyond the rim."

This, he says, is plainly shown by Figs. 5 and 6 of his drawings.

In the patents to Elliot, Nos. 440,701 and 440,702, the channel sides are shown to slightly flare. In one of his patents he says:

"By making the metallic tire in this manner, the rubber tire, when compressed by a direct or lateral pressure, and thereby overlying the metallic edges, will not be cut or injured by said edges."

In the English patent to Willoughby, of 1892, No. 18,030, very many forms for metallic channel tire seats are shown, two of them showing a slight flaring at top of sides. Examples are also to be seen in Myers, of 1892, No. 468,971, and Beirsmith, of 1890, No. 424,452. In the English patent to Robertson of 1890, the same

flaring sides are shown, and somewhat more emphatically than in any of the before-mentioned patents.

Grant describes his rubber tire as having a "peculiar shape." He says:

It "is formed of substantially the same depth as width. The outer periphery, however, is formed on the arc of a circle of much smaller diameter than the width of the rim, the exposed sides of the tire being formed, preferably, on the lines, $c^2$, at an angle to each other, and also to the flanges, b', of the wheel rim. The unexposed portion of the tire, or that portion which is inclosed within the rim, is formed of substantially the same shape as the inner channel of the rim, that is to say, it is tapered from the outside inwardly, so that the sides of the inner or unexposed portion of the tire are also formed on the lines, $c^3$, forming, with the lines, $c^2$, an obtuse angle."

This obtuse angle or corner he describes as falling below the outer periphery of the flanges, b', and within the channel between said flanges. The "peculiar shape" is better understood by reproducing Fig. 2 of his drawings:

The purpose of the patentee in adopting this "peculiar shape" for his rubber tire, as explained by himself in his specifications, is as follows:

"By having the sides of the exposed and unexposed portion of the tire formed inclined, and at an angle to each other, as described, the compression of the tire in use is such that all portions of the rubber are retained within the channel or groove, and no portion of the rubber is forced over the side of the flange, which would result in cutting or grooving the tire at the corner or angle, which would eventually cause the tire to break from this point inwardly to the openings, c'."

The rubber tire of Owen, before referred to, was primarily a velocipede tire, and was made of two layers of rubber, the outer part being cushioned on an unexposed and softer body of rubber. But the reasons which moved Owen for adopting the form shown in his patent for the crown or exposed portion of his rubber are strikingly like those set forth by Grant, and a comparison of Figs. 5 and 6 from the Owen patent with Fig. 2 of the Grant patent will show substantial unity of design, so far as the crown or exposed portion of the rubber in each is involved. In both the channel rim is flaring, in Grant's somewhat more so than in Owen's; but in each there is a space within which the compressed rubber may be

crowded without projecting over the edge of the tire seat. In each
the widest part of the rubber and the obtuse angle or corner are
located "within the outer periphery of the flanges," which is the
claim of the patent, and slightly "below the outer periphery of the
flange, b'," which would fill even the letter of Grant's specifications,
though Owen's drawings do not show this angle or corner to be
so far below the periphery of the flanges as is shown by Grant's
drawing. In the design patent to Coops, 1891, No. 20,678, is shown
a design for a rubber tire which very clearly anticipates Grant's pecu-
liar shape, including his corner or angle. So, in the English patent to
Linton, there is a substantial anticipation of Grant's "peculiar shape."
Grant's rubber is shown to be provided with two openings or holes
extending through the rubber longitudinally, through which are
passed two independent retaining wires. These openings, when the
rubber is in its seat, are "within the outer peripheries of the flanges."
The ends of the wires are to be united together "after the rubber
has been compressed endwise on said wires, thus forming two in-
dependent and continuous retaining wires within the rubber tire,
the ends of which, by reason of the compression, are brought to-
gether so as to entirely cover the wires and the united ends there-
of." Many methods of retaining the rubber in its seat on the tire
are shown in the old art, and among them retaining wires. As far
back as 1861, in the English patent to Parfrey, is shown a rubber
tire retained by a "ring or hoop of inelastic material, preferring
iron for such purpose"; the "rod" being passed horizontally through
the rubber tire, the two "ends" being welded or otherwise connected
together, producing a continuous "ring" of inelastic material at the
core of the rubber ring. It is not stated whether this "ring" or
"rod" of iron is to be round or flat. The patent is apparently a
generic one so far as it points out the employment of a continuous
band of iron extending longitudinally through the rubber ring as a
means of retaining the rubber in its seat. The Claypool American
patent of 1890 is also instructive in this matter of means for re-
taining the rubber by wires or tightening bands extending horizon-
tally through interior of the rubber ring. He shows the use of
either one or more tightening wires; the ends being either tied to-
gether, as in Grant's, or tightly tied to outer surface of the tire.
Claypool's wires were not threaded through the circumferential
opening in his rubber, but placed therein through a slit extending
from his opening to the outer surface of the rubber, a slit which
would tightly close when the wires were tightened to compress the
rubber to base of rubber seat. Examples of the employment of
two wires may be seen in the Robertson patent of 1890, the Wil-
loughby patent of 1892, the Welch patent of 1890, and the Timber-
lake patent of 1890, all English patents. In Willoughby the wires
are coiled in parts to make them elastic, and are either threaded
through circumferential openings or molded with the rubber. The
Elliot patent, No. 440,702, shows a flat band or tape of iron pass-
ing longitudinally through the rubber at a point below the periphery
of his metal channel sides. The ends of his iron band pass out
through an opening in the tire and felly, and are secured to the

inner surface of the felly. Elliot does not limit himself to a flat binding strip, though he says he prefers that form, and some of his claims are broad enough to cover a round binding wire such as is used by Grant.

We have gone far enough into the history of the old art, without, by any means, exhausting the subject, to show: First, that it was not new to set solid rubber tires into iron channels with flaring flanges, the widest part of the rubber being below the periphery of the channel sides; second, that it was not new to use solid rubber bands of the "peculiar shape" of that employed by Grant, so far as that shape has any substantial bearing upon the question of novelty here to be considered; and, third, that it was not new to use one or two or more wires for the purpose of retaining the rubber tightly in the channel seat. Practically, this is conceded by the learned counsel who have argued this case for appellees. But their concession has been accompanied with such narrow concessions as to the teaching of the old art, and with such wide claims for the concrete results of the combination of these old elements made by Grant, as to make it essential to show something of the old art and of the functions in that art of the elements of Grant's combination, that we may better understand the contention that the combination of the patent is new, and the result novel and patentable.

While conceding that the individual parts of the Grant claims are old, it is insisted by appellees that these parts have never been before brought into a combination where the parts are so arranged as to co-operate in the production of a new and useful result. It may be conceded that no rubber tired wheel in the old art has been shown which includes each of the identical parts which unite to make Grant's tire. We find Grant's channel rim in one, his two or more wire system of attachment in another, his peculiar shaped rubber strip in still another. Again, we may find two of Grant's parts co-operating in one structure; the third being represented by something not quite the same, but accomplishing separately, possibly not so well, the same function attributed to Grant's third element. A careful study of the history of the art brings us very decidedly to the conclusion that the most that can be claimed for Grant is that he has selected those old parts which he deemed could be most advantageously employed together, and has produced a rubber tired vehicle wheel which is probably more durable than any one rubber tired wheel theretofore known to the industry. To combine old parts in such manner as to produce a new result by their harmonious co-operation may be patentable; but it is equally true that where the combination is not only of old parts, but of old results, without the addition of any new and distinct function, the combination is not patentable. Hailes v. Van Wormer, 20 Wall. 353, 22 L. Ed. 241; Pickering v. McCullough, 104 U. S. 310–318, 26 L. Ed. 749; Florsheim v. Schilling, 137 U. S. 64–77, 11 Sup. Ct. 20, 34 L. Ed. 574; Knapp v. Morss, 150 U. S. 221–227, 14 Sup. Ct. 81, 37 L. Ed. 1059; Office Specialty Mfg. Co. v. Fenton Metallic Mfg. Co., 174 U. S. 492–498, 19 Sup. Ct. 641, 43 L. Ed. 1058; Stearns & Co. v. Russell, 29 C. C. A. 121, 85 Fed. 218;

116 F.—24

Overweight Counterbalance Elevator Co. v. Henry Vogt Mach. Co., 43 C. C. A. 80, 102 Fed. 957, 961, 962; Brinkerhoff v. Aloe, 146 U. S. 515, 516, 13 Sup. Ct. 221, 36 L. Ed. 1068; Reckendorfer v. Faber, 92 U. S. 347, 23 L. Ed. 719; Muller v. Tool Co., 23 C. C. A. 357, 77 Fed. 621–628.

In Overweight Counterbalance Elevator Co. v. Henry Vogt Mach. Co., cited above, this court, speaking by Judge Severens, said:

"There is no invention in merely selecting and putting together the most desirable parts of different machines in the same art, where each operates in the same way in the new machine as it did in the old, and effects the same result. No principle of the patent law stands on plainer reasons than this. A somewhat leading case on this subject is Hailes v. Van Wormer, 20 Wall. 358, 22 L. Ed. 241, and the principle is illustrated by the decisions of this court in the following cases: Manufacturing Co. v. Robbins, 43 U. S. App. 391, 21 C. C. A. 198, 75 Fed. 17; Stearns v. Russell, 54 U. S. App. 591, 29 C. C. A. 121, 85 Fed. 218; Campbell Printing Press & Mfg. Co. v. Duplex Printing Press Co. (decided at this term) 41 C. C. A. 351, 101 Fed. 282. It is, of course, conceded that when the assembled old elements effect a new mode of operation, producing a more beneficial result, this rule does not hold. In such case a deeper insight leading to the perception of new results from new co-ordinations of old elements may be exercised in a degree amounting to invention. The distinction is clear, though it may happen, as it constantly does in the application of other principles, that difficulty may be found in cases which hover along the line between the mere assembling of old elements and the putting them into such relations that, co-acting, they have a different and more beneficial mode of operation."

The mere bringing together of old parts and allowing each to work out its own old effect without producing some new machine or product is not invention. A combination of old elements, to be patentable, "must produce a different force or effect or result, in the combined forces or processes, from that given by their separate parts. There must be a new result produced by their union; if not, it is only an aggregation of separate elements." Reckendorfer. v. Faber, 92 U. S. 347–357, 23 L. Ed. 719. "In a patentable combination," said Mr. Justice Matthews, speaking for the court in Pickering v. McCullough, cited above, "of old elements, all of the constituents must so enter into it as that each qualifies every other. * * * It must form either a new machine of a distinct character and function, or produce a new result due to the joint and co-operating action of all the elements, and which is not the mere adding together of separate contributions. Otherwise it is only a mechanical juxtaposition, and not a vital union." From the settled law as shown by the cases we have cited, it is plain, that to sustain Grant's patent for a combination of old parts, taken from the same identical art, it must appear either that he has produced a new article of manufacture, or a new machine having a distinct character or functions, or a new result must have been obtained in rubber vehicle tires which is due to the joint and co-operating action of all the old devices. We may dismiss from consideration any inquiry as to whether Grant's construction constitutes either a new machine or manufacture having distinct characteristics or new functions, for no such claim has been advanced. Has, then, a "new result" been obtained, and is that result due to the mechanical co-

operation of all the old parts of the combination? That the rubber tire produced by Grant has proven a more satisfactory tire in point of stability and endurance is urged as evidence of a "new result." In Loom Co. v. Higgins, 105 U. S. 580, 591, 26 L. Ed. 1177, the patent was for a new arrangement of elements separately known before, by which a loom was able to produce 50 yards a day when it had never produced more than 40 before, and was held patentable. In that case Justice Bradley said:

"It may be laid down as a general rule, though, perhaps, not an inviolable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention."

This rule, thus cautiously stated, has been approved in later cases. The Barbed Wire Patent, 143 U. S. 283, 12 Sup. Ct. 443, 36 L. Ed. 154; Muller v. Tool Co., 23 C. C. A. 357, 77 Fed. 621–628. But in both the cases cited there was a new result, and in both cases the only question was whether this new result constituted invention or mere mechanical improvement. Now, if Grant's construction is an aggregation of well-known parts, each part doing its own appropriate function in substantially the old way, it does not show a patentable invention, even though the sum of all the old results is a tire more serviceable or durable than shown in the old art. Hailes v. Van Wormer, 20 Wall. 353, 22 L. Ed. 241; Office Specialty Mfg. Co. v. Fenton Metallic Mfg. Co., 174 U. S. 492–498, 19 Sup. Ct. 641, 43 L. Ed. 1058; Richards v. Elevator Co., 158 U. S. 299, 15 Sup. Ct. 831, 39 L. Ed. 991; Overweight Counterbalance Elevator Co. v. Henry Vogt Mach. Co., 43 C. C. A. 80, 102 Fed. 949; Smith v. Nichols, 21 Wall. 112, 22 L. Ed. 566.

But it is said that Grant has made a combination of parts never before used together, and that he has so arranged the parts used as to obtain the co-operative action of all the parts, and, by such joint action, has produced a new result in a rubber tire more useful and durable than any theretofore known. The claim that the old parts selected from old combinations do not operate in their new association substantially as they did in the combinations from which Grant took them is the turning point of the case. It cannot be denied but that there is a certain kind of co-operation in the accomplishment of the result aimed at between each of Grant's elements. The object is to attach a solid band or strip of rubber to the periphery of a vehicle wheel. Now, the channel rim adapted to fit the lower part of the rubber, the rubber adapted to fit within the channel sides, and the fastening bands or wires used to assist in the retention of the rubber band in its position on the periphery of the vehicle wheel, are each contributing to the one common purpose. But that kind of co-operation is not new, for it necessarily existed in every prior structure where a channel rim with flaring sides was found in association with fastening wires as a means of retaining the rubber in its seat. But do they co-operate in any new way or produce any new result by reason of anything which Grant has done? What he set himself to do was to attach a rub-

ber tire to a vehicle wheel in such way as that it would best retain its position with the least amount of cutting and waste. To adapt his rubber to his channel rim, and to retain it in the latter by means of fastening bands of iron or circumferential wires, was old and well known. He adopted wires preferably to a band or tape of steel. The old art taught him that it was best to use two wires, one on either side, in preference to a flat band or a single wire. He found that the exposed crown of the rubber was subject to compression when in use, and liable to be pressed laterally over the edges of the iron channel in which it was seated. He found that the old art taught that this might be guarded against by making his channel sides incline outwards at the top, thereby leaving a space into which the lateral extension of the exposed crown of the tire might be crowded. This teaching of the art he adopted, and he selected that form of channel rim which gave him this protection against the cutting or grooving of his rubber. He also found that in the old art, notably in the patent to Owen, this danger of cutting under lateral pressure was diminished by reducing the width of the rubber tire above the flanges of the channel rim, and giving it such form "within the semicircle" as that, when subjected to lateral expansion or enlargement, will not cause the tire to project beyond the rim. From the drawings of this Owen patent, and from the teaching of the Owen invention, in reference to the best plan for avoidance of cutting under lateral expansion, comes the shape of Grant's rubber tire above the flanges; for Owen shows the corner or obtuse angle below the periphery of the channel sides substantially as in Grant. The location of the two retaining wires below the periphery of the rim flanges was also taught in the old art. It is shown in a number of structures, including the Willoughby, Welch, Robertson and Timberlake. In Elliot his retaining band is located below the periphery of his channel flanges, and in Claypool's just below or in line with the top of the channel sides.

Up to this point, it is to us very evident that each of the old parts selected from the old art produces in its new relation substantially the same result which was characteristic of it in the combination from which it was taken. While there is in some sense a co-operation of all the parts, for even the re-enforcing strip across the bottom of the rubber ring contributed to hold the rubber in its seat by enabling it the better to resist the cutting effect of the wires under a great strain, we are unable as yet to perceive that the parts co-operate in any new way, or that any new function has resulted from the new combination. The apparent function of each of the old parts in the new arrangement is the precise function of the same parts in the old combinations from which they were taken. The combined result is seemingly but the sum of the old results of the same parts, when used in former structures of the same kind. But the appellees contend that Grant's channel rim, rubber tire, and retaining wires do, as a consequence of their relation to one another in his combination, perform a new function, or operate in a new way to produce a new result; and that this new mode of operation is novel and beneficial, and constitutes

invention. Oddly enough, the new mode of operation to which the novelty of Grant's combination is attributed is not mentioned in the specifications, and its discovery is due to the keen optimism of professional experts. This new capacity claimed for Grant's structure is a supposed capability of his rubber for lateral movement. This new function, says Mr. Livermore, an expert witness for the appellees, "consists in permitting the tire to rise slightly from the rim at either side independently of the other when subjected to very great strain, and to immediately reseat itself when such strain is removed." It is claimed that in the old art the struggle was to fasten the rubber in its seat as securely as possible, but that Grant discovered that this was a mistake, and that "the real problem was to construct a rubber tire in such manner that the rubber would be permanently and positively held upon the rim of the wheel, and yet of such form that would permit the rubber some movement forward or backward and to either side as well." Again, counsel says, "the problem was certainly paradoxical, in that the rubber must be held as securely as possible, and yet it must not be held too rigidly. Others tried to prevent any movement. Grant's construction was such that the rubber could have some movement." To secure this capacity for some movement of his tire, counsel say Grant has "so arranged and emphasized the importance of the relative arrangement of the wires, channel iron, and rubber in relation to and in co-operation with each other, that under extraordinary conditions the parts operate together, so that a severe lateral strain on either side of the rubber tire is compensated and allowed for by permitting the rubber to yield and move in the channel, and reseat itself after the strain." "This arises," say counsel, "from the wide, open channel, the angle or corner or widest portion of the tire being just below the mouth of this channel, and the independent retaining wires, which permit the tire, under severe lateral strain, to rise slightly on either side and reseat itself, thus relieving that part of the tire which meets the obstacles from the severe shock which might otherwise tear it asunder at this point." "To secure this result," says the expert, "it is essential to have, as in the Grant tire, two independent fastening wires, one at each side of the middle and normally below the level of the flanges of the rim, so that one will remain in normal position and prevent displacement of the tire to such an extent as to preclude its returning to normal position while the other is yielding to relieve the tire of excessive strain." The witness continues by saying: "If a single central fastening wire were used, there would be danger of the tire rolling around it as a center, and becoming displaced, so that it would not reseat in normal position when it would not properly perform its other functions, but would be liable to be cut and damaged, since its immunity from cutting depends upon the form of the channel and rubber, and upon the two being retained in their normal working relation to one another. If a single fastening, or even two fastenings, were placed high up in the body of the rubber, above the level of the tops of the flanges of the rim, they would be liable to yield sufficiently to lift clear over the rim flange, so that the tire would at

once fall off." It is very plain that the degree, if not the very existence, of this capacity for "side tipping," depends upon the tension of the retaining wires. To tighten the wires to their utmost tension must in the very nature of things compress the rubber beneath them as much as its elasticity will permit. It must therefore follow that Grant's retaining wires must not be tightened to the highest tension of the wires, for, if that is done, there can be no beneficial yielding of either rubber or wire under a violent lateral strain, and either the rubber must be cut by the wire, or the wire break, before there can be any "rising" of the rubber tire on one side to meet such strain. This dependence of this supposed new function upon the tension of the retaining wires was recognized and emphasized by Judge Thomas in Rubber Tire Wheel Co. v. Columbia Pneumatic Wagon Wheel Co. (C. C.) 91 Fed. 978–980, where this patent was sustained upon the ground, mainly, if not entirely, that this function of yielding laterally under violent pressure from one side was a new function, the fruit of the joint action of all parts of Grant's combination. In that case Judge Thomas, in describing the functions of the parts, said, in speaking of Grant's two independent wires, that "the ends of each wire are fastened together, *after having been drawn sufficiently tight to hold the rubber within the channel, but not so rigidly as to prevent the rubber moving slightly in its seat, and thereby to a degree yielding to any force opposing the progress of the wheel.* This latitude of movement, together with the elasticity of the rubber, permits the tire to accommodate itself to the obstacles with which it comes in contact when the wheel is in motion. This lateral movement allowed to the rubber, whether rising from its *permissible turning on the wires* or from its own elasticity, or both, and the adaptions which, notwithstanding such movement, tend to preserve the tire from abrasion by the rim, are essential features of the tire." (The italics are ours.) That this capacity for side tipping or lateral movement under violent lateral strain is an operative function inherent in the particular arrangement of the old parts constituting Grant's combination is dependent wholly upon expert opinion. Its actual presence from practical experience or observation is not shown. Neither are the experts able to deduce this function from the instructions of the patent concerning the construction of the wire, for the patent is silent in respect not only to the function itself, but as to the proper tension of the wires in order to obtain it beneficially. Nor do the experts now advise us as to the proper tensile strength of the retaining wires to be used, nor as to the proper degree of softness or hardness of rubber below the wires in order to secure the highest degree of noncutting and nontearing strength in the rubber under the wires. Indeed, the experts admit that they do not know the tensile strength of either wire or rubber used by Grant, or of that the best adapted for use. The advantage which is claimed for this alleged capacity of side tipping or tilting is that thereby the wire is prevented from cutting or tearing through the thin body of rubber between it and the base of the rim in which it sits. The expert Livermore, so often referred to heretofore, says touching this capacity:

"If, therefore, the tire should be subjected to a severe lateral strain, such as would be sufficient to tear it apart if all borne on the rubber between the fastening rim at the point where the pressure is applied, * * * the fastening wire on that side, * * * by reason of the compression of the rubber lying between it and the bottom of the channel entirely around the rim, can rise or yield to the excessive strain applied to the rubber, and thus relieve the latter before it is in danger of being torn apart."

But if the retaining wires were tightened to their full tension when their ends were welded or otherwise united, this capacity "to rise or yield to the excessive strain applied to the rubber" is not shown to exist. The degree, then, of this new capacity is clearly dependent upon the normal tension of the retaining wires. If this element of the proper tension of the retaining wires be eliminated, we have no foundation whatever for supposing that this capacity for lateral movement exists to any beneficial extent as a result simply of Grant's combination and arrangement of old elements. If the wire on the side from which a strong shock has come gives or rises, and the rubber turns on the wire and upon the opposite corner of the rubber, as on a pivot, it is because of some capacity of the wire to thus move laterally under strain, due to the fact that it was capable of some further tightening without breaking, and the rubber of some further yielding, by reason of its natural elasticity, without tearing. But, if these capacities of the wire and of the rubber have been practically exhausted by reason of the tension originally put upon them, there can be no beneficial capacity for side movement of either under severe lateral strain. The specifications give no hint of this alleged joint action of all the parts to produce this tipping action, or of the advantage therefrom in preventing the tearing or cutting of the rubber under the wires. If this capacity for side movement be a beneficial function plainly inherent in Grant's combination and arrangement of old parts in relation to each other, and not a mere "obscure property lurking in some accidental corner of his device," it was not essential that the patentee should point it out as one of the advantages of his structure. This is because he has invented a machine, structure, or manufacture which includes in its necessary mode of operation the function in question, and, whether the inventor knew or not the full measure of the beneficial functions of his structure, he is entitled to all the uses of his invention. Goshen Sweeper Co. v. Bissell Carpet Sweeper Co., 19 C. C. A. 13–20, 72 Fed. 67; Dowagiac Mfg. Co. v. Superior Drill Co. (decided by this court at present term) 115 Fed. 886; Wells v. Curtis, 13 C. C. A. 494–498, 66 Fed. 318. In Goshen Sweeper Co. v. Bissell Carpet Sweeper Co. and Dowagiac Mfg. Co. v. Superior Drill Co., both cited above, we held the patentees entitled to all the advantages of their devices, whether pointed out or not. But in both cases the advantage or function resulting in the advantage was a property or function plainly inherent in the very structure or device when constructed according to the drawings and specifications of the patent. In both cases the description of the invention was so full that if followed the particular function

or advantage pointed out would result as a necessary consequence of the law of the structure. But this is not so in respect to the undescribed function of the Grant device, for he neither mentions any such capacity, nor describes such an arrangement of his retaining wire as will secure a capacity for "rising or yielding" under lateral strain as a necessary result of the tension so provided for. The problem, so far as the public is concerned, is to remain a problem. The old art, say counsel, taught the necessity of a very secure attachment of the rubber in its rim. The inventor, according to the claims now made by him, turned his back upon all the teachings of the old art in this matter, and struggled to secure his rubber so that it should hold its place, and yet should be capable of some side movement as a means of yielding to violent side blows, instead of persistently resisting at the expense of a torn rubber or a broken wire. We learn now that this capacity for any beneficial yielding is dependent upon the wires being properly adjusted originally, and that this proper tension depends upon the right judgment of the workman. If this tipping capacity had been pointed out, and even this indefinite direction given by the patentee as to the mode of securing that operation, the patent might possibly be saved, though this we need not consider. But neither the advantage of such a function, nor any hint that it is in any wise dependent upon the normal tension of the retaining wires, is to be found in the patent. How, then, is it possible for the public to obtain a knowledge of this new function, its advantages, or how best to secure the proper tension of the wires to allow of this capacity? If it exists in Grant's arrangement of old parts, it is an accidental mode of operation dependent upon the normal tension of the retaining wires in the particular tire. It is the duty of a patentee to disclose his invention, that the public may be able to practice it when the monopoly expires. This disclosure should include the mode of operation as well as a method of construction. Grant has not disclosed this alleged capacity of his structure for rising or yielding on one side under severe lateral strain, nor has he disclosed any method of securing same by the proper arrangement of the retaining wires to produce the proper tension upon which this capacity in any beneficial sense depends. Bates v. Coe, 98 U. S. 31–39, 25 L. Ed. 68; Wells v. Curtis, 13 C. C. A. 494, 66 Fed. 318; Kelly v. Clow, 32 C. C. A. 205–212, 89 Fed. 297. Eliminating this alleged new feature, we are unable to find in Grant's combination any new mode of operation or any new result. As was said about another inventor in another case, Grant has shown great industry in acquiring knowledge of what others had done or taught in the attempt to make a marketable rubber tire wheel, and has shown good judgment in selecting from earlier structures or earlier teachings the best of the devices thus made known, and good judgment in combining them with mechanical skill. But we can discover no trace of invention or original thought, for his parts as combined do substantially the same operations which they did in the combinations from which he took them. He has united the most bene-

ficial features of other patents, and in that sense has made a new combination. But he has not produced a new manufacture or a new result in a patentable sense. He cannot be said in any true sense to have taken the much talked of "last step." His steps are all in the tracks of those who have gone before. Rubber tired wheels had been successfully made for many years. The Elliot wheel, exhibited, is shown to have been used more than five years without being yet worthless. Grant's tire may be in some respects an improvement upon any particular structure, but it is an improvement not due to any new mode of operation, and the parts contribute to the common result just what they did in the combinations from which they were taken. Much of the superiority, or rather superior durability, of Grant's tire, is undoubtedly due to the quality of the rubber used, in respect to which there has been in late years a great improvement.

Much stress has been laid upon the commercial success of the Grant tire. Aside from the fact already mentioned, that much of the durability of the tire is due to the better quality of rubber used, there is much evidence that this success is to be largely attributed to the power of great capital in buying or crushing out rivals, and to great business push and advertising. There is too much evidence in this record as to consent decrees against rival makers of tires to predicate much upon the mere fact that the Grant tire has met with a large sale. The general use of a patented article is only evidence of value when the novelty or utility of the article is a matter of great doubt, and its evidential value in even such cases is nothing when it can be attributed to something other than novelty. Watch Case Co. v. Robbins, 21 C. C. A. 199, 75 Fed. 17; Lane v. Welds, 39 C. C. A. 528, 99 Fed. 286; McClain v. Ortmayer, 141 U. S. 419, 12 Sup. Ct. 76, 35 L. Ed. 800.

Believing the patent to be void for want of patentable novelty, we need not consider any question of infringement. Reverse the decree and dismiss the bill.