## GENERAL SUB-CONST. CO. v. NETCHER et al.

### (Circuit Court, N. D. Illinois, E. D. February 11, 1909.)

### No. 28,238.

1. PATENTS (§ 160*)—CONSTRUCTION—READING SPECIFICATION INTO CLAIMS.

   For the purpose of sustaining a patent, as where a nonpatentable principle or function appears to be claimed, but the specification shows that the patent was sought for a machine, device, or process which is patentable, the specification may be read into the claims, but not for the purpose of escaping anticipation or establishing infringement.

   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 235; Dec. Dig. § 160.*]

2. PATENTS (§ 160*)—CONSTRUCTION—READING SPECIFICATION INTO CLAIMS.

   A feature of a process not covered by the claims of a patent, but merely recommended in the specification, instead of being required or stated to be an essential part of the process, cannot be read into the claims.

   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 235; Dec. Dig. § 160.*]

3. PATENTS (§ 328*)—ANTICIPATION—PROCESS OF MAKING SUBSTRUCTURES FOR BUILDINGS.

   The Ewen patent No. 718,441, for a process of making substructures for buildings, as such process is described in the claims, is void for anticipation, the real process as practiced by means of the appliances described in the patent not being covered by the claims.

   [Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

In Equity. On final hearing.

Parker & Carter, for complainant.

Moses, Rosenthal & Kennedy, for Netcher.

George S. Payson and Russel Whitman, for Holabird, Roche & Renwick.

Offield, Towle & Linthicum, for John Griffiths and John Griffiths, Jr.

SANBORN, District Judge. This is a suit in equity for the alleged infringement of letters patent No. 718,441, issued January 13, 1903, to John M. Ewen, covering a mechanical process or method of making substructures for buildings. The general purpose of the inventor was to so construct the exterior wall trench, extending around the proposed building, as to sustain and equalize the lateral pressure from adjoining buildings and streets, without the necessity of shoring or underpinning them. While the owner of land may

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

not remove the lateral support of adjoining land in its natural state, he may do so as to artificial structures, provided he uses ordinary care. This is the common law. But in a large city a builder cannot afford to stand on his common-law right. Business necessity and the convenience of his neighbors, his own power to proceed uninterruptedly with his building, the probability of litigation over the vexed question of ordinary care—always a troublesome question, and one immensely difficult in lateral support cases—all combine to influence him to find some means of sustaining adjoining structures while proceeding with his own. Indeed, it has become the general if not universal custom in large cities for builders to do this, and contracts for large buildings commonly so provide; so the necessity in building operations in large cities for some practical means of sustaining adjoining buildings is apparent. Another important element of the problem is the deep basement, lately made more important by the construction of the Chicago Subway.

The problem of lateral support in building operations has always been an important and difficult one, and it was partly solved more than a hundred years ago. In 1803 the center-core system, as it has been called, was used on the Tronquoy Tunnel in France, and has been ever since employed in some form. This system is the leading feature of the Ewen patent, and has long been applied to parallel longitudinal trench open-cut tunneling. Its simplest illustration is a street subway. Two parallel trenches are dug, one on each side of the street. These are lined with planks or timbers, braced with pieces of timber to prevent caving. The middle of the street is the center core. A stone wall is built in each trench, girders laid from the top of the walls to a column set in the street center, and the street surface constructed upon the girders. The core of earth is then removed, and the tunnel complete. This description is not technically accurate, but good enough to illustrate the plan of overcoming lateral pressure by the center-core system, with its trenches, trench linings, and braces, the girders finally taking the place of the core. It was employed in the great Boston subway, built in 1896 and 1897, and was fully known to the inventor when he conceived his invention in 1902. The system is completely described in the Goodredge patent of 1882, No. 262,403, except that sheet piling or plank driven into the earth, edge to edge, is used to line the trenches, without braces; was applied to a single trench by Friestedt, in his patent of 1890, No. 435,492, for supporting and lowering building foundations; and the feature relating to the use of linings and extensible braces is covered by the McKiernan patent of 1873, No. 145,116. Some features of the system also appear in other illustrations of the prior art, among others the Washington patent of 1900, No. 654,426. It was also employed on the east wall of the Tribune Building in Chicago in 1901, where a rigid wall was constructed on the outside of the wall trench, and a flexible lining on the inside against the earth core, the space between the two being braced by jackscrews. This is shown by the following cut:

It was the Tribune building, the first deep-basement construction ever put up in Chicago, and the difficulties experienced in building it, which led the patentee to study the subject of subconstruction, and resulted in his application for the patent in suit in 1902. It is now insisted by the patentee that his improved system was never used in building operations or elsewhere, prior to his application, was never conceived, understood, or intentionally applied by anybody, and had never in any way been anticipated. His process may now be described.

It is nothing more than a simple application of the center-core system to the skyscraper deep-basement problem, with some improvements of process which are said to be vital. The patent is for a process, an operation done by rule to secure result, or a mode of treatment of materials producing a result. It is not a machine, device, or function of a machine, but simply a method of doing things. A trench is dug to any desired depth on two or four sides of a proposed building, and in place of the removed earth linings and jackscrews are substituted to hold the trench walls in place, and thus interpose as nearly as possible the same resistance to lateral pressure as existed before the trenches were dug. Walls are then built in the trenches, continually braced meanwhile by the adjustable jackscrews, against the center core on one side and the adjoining property on the other, so as to constantly maintain the requisite resistance to lateral pressure, and thus prevent settling, and finally the walls are braced on the inside by basement floor girders, and the earth core removed.

From this general description it will be seen that so far nothing appears to distinguish the process from the center-core system used a hundred years ago, except it is employed for a new purpose. But from a more specific description a number of other features, claimed to be essential parts of the process, will appear. From the description and claims of the patent and the testimony in explanation of it, the mode of operation, more in detail, is as follows: Around the whole building site, with heavy buildings on two or three sides and across the street, a trench is dug of any desired width, one foot in depth according to the patent, and five feet deep in practice. This trench is not commenced at the street level, but it is customary in applying the method of the patent to dig out the earth under the proposed new building down to a point opposite the footings of adjoining buildings, as this may usually be done with safety, meanwhile shoring their walls. The trench is then dug five feet deep and eight or ten feet wide all around the site. A sheath or lining of planks is set up endwise on each wall of the five-foot trench around the whole site. Crosspieces called "walings," about 12 feet long, are then placed crosswise on each lining, and are held in place by jackscrews, thus dividing the lining into loose sections 5x12 feet. The planks are not fastened together, nor are the walings fastened to the plank linings in any way, but the planks are generally matched staves so as to make a tight connection. The banks of the trench are sustained and braced by the operation of the jackscrews

against the crosspieces or walings, the screws being kept tight by manipulation where necessary. The lateral thrust or pressure from the earth outside the trench is thus taken up by the center core, just as in the old system, and the screws or braces kept tight. This process is repeated for the next five feet, and so on until the desired depth is reached; but variation in the conditions may require a variation in the process.

It is easily seen, if the soil is as described by the witnesses, composed of plastic clay, with quicksand pockets, full of strata containing water and gas, that, when the trench is dug out near the footings of a heavy building, the gas, water, quicksand, and mud are liable to come out into the trench, even before the lining can be adjusted, and also be forced up from the bottom of the trench by the lateral thrust. Water will also at first run through the cracks of the lining between the lining planks unless matched staves are used, as in the County Building. This soil movement will allow the adjoining buildings to settle to some extent, and even buildings from half a block to a block distant may be slightly affected; and it will displace the soil in the outer banks of the trench, and affect the pressure there localized.

It is at this point that the alleged invention appears, the part of the process not used in the prior art, and which is the one discovery claimed by the patentee. The discovery is said to be this: that it is found, if the jackscrews be constantly manipulated and kept tightly screwed up, and the movable sections of the linings of the trench, approximately five feet by twelve, be kept firmly pressed against the trench walls, a constant and even distribution of the lateral pressure from the earth outside the trench, through the jackscrews to the supporting core inside the trench, will be maintained, and the adjoining buildings protected from substantial injury. Other constructors and inventors, in considering the solution of the problem, had, it is said, fixed their attention on the adjoining building, and had attempted, by shoring, piling, and other like devices, to hold it up. Ewen, on the other hand, regarded only the earth, and the feasibility of preserving the lateral support of the center core, existing before the trench was begun, and, so far as possible, maintaining original conditions. This is stated by complainants' counsel as follows:

"To excavate this core or open a trench for the substructure, it is necessary to uncover one side of the building support, and this results in: First, a tendency of such support to move bodily or en masse toward the excavation; and, second, a tendency of the earth support to flow, to change its nature, structure, density, and, in short, its character, as a supporting medium (giving away in detail), and thus let the building sink and crumble, although it may not fall into the excavation.

"Either of these tendencies will wreck the old buildings, and hence must be resisted. With buildings light or far removed from the trench or with a shallow trench, the first tendency is easily resisted, and the second is negligible, but no one before Ewen had ever overcome the first tendency under the conditions of the problem, and no one had ever appreciated or tried to overcome the second tendency under any conditions."

This use of the thin lining, called the "floating" or "flexible" lining, and this constant operation of the jackscrews, are claimed to

be the two vital features of the invention, which distinguish it radically from the prior art. If Mr. Ewen is really entitled to them, I should have little hesitation in sustaining his patent. The art is a most difficult and important one, and any person who can find a process for safely sustaining lateral pressure in the business district of Chicago and other large cities is certainly entitled to all the benefit afforded by the patent laws. I am inclined to think he did discover them, without himself knowing it, but that he never fully understood or claimed them, and that his discovery has become public property.

It seems clear from the specifications, from Ewen's advertising matter, and his actions, that he never fully understood his system, although he knew enough to vaguely describe it. Thus, in the specifications, discussing the work at a stage when the trench has been fully completed and sealed up, and the wall built, he says:

"Obviously up to this point the conditions of stress and pressure between the exterior of the proposed building and the core of earth on the site of the building are practically undisturbed, and whatever weight there was on the exterior, as, for example, the weight of some building, is properly sustained against the core of earth within the building site. The pressure is taken up by the jackscrews, and then by the shorter jackscrews which act through the vertically arranged I-beams."

How this could have been written by an able and experienced engineer, describing his own patent, understanding that the danger point, the cutting of the trench, had long since been passed, is difficult to understand. Further than this, the operation of the jackscrews is not mentioned as a part of the process while that is being described, but is stated as a result, following from the necessary operation of the process. Thus, after fully describing how he does it, but without saying anything about the flexible lining or manipulation of jacks, he says it is obvious that the substructures may be carried downward to any desired depth, because the inner core carries the same load and sustains the same pressure all the time; but how or why it does so is not explained. Then a sort of parenthetical clause is thrown in, to the effect that jackscrews are used (instead of rigid braces, supposedly) because they are adjustable, and in large buildings (not in small buildings or medium-sized buildings surrounded by skyscrapers, but only in large buildings, no matter what the weight on the adjoining property) would be constantly attended and operated so as to keep the condition substantially uniform. Of course, the size of the building being erected is not an important factor, but the weight on the adjoining soil. All this loose talk in the specification shows how little the inventor really appreciated or understood his own invention.

When we come to the claims of the patent we find even less to suggest these vital features. They are twelve in number, and contain a page and a half of closely printed matter, but not one of them has any suggestion of the flexible lining or constantly operated jacks. All but one of them call for trench linings and braces between them, "so as to transmit the exterior pressure to the core of earth within such proposed wall," but nothing more. Claims 2 and 10, relied on as infringed, are as follows:

"(2) The process of making and placing in position substructures for buildings and the like, which consists in forming a suitable trench where the exterior wall is to be erected, and simultaneously placing in position a lining for said trench, from the top downward, as the work of forming the trench progresses, then placing braces between the two linings, so as to transmit the exterior pressure to the core of earth within such proposed wall, then erecting within the trench a wall of less thickness than the width of the trench, and, as the wall progresses, substituting for the braces between the two linings braces between one of the linings and the wall."

"(10) The process of making and placing in position substructures for buildings and the like, which consists in forming a suitable trench where the exterior wall is to be erected, and simultaneously placing in position a lining for said trench, from the top downward, as the work of forming the trench progresses, then placing braces between the two linings, so as to transmit the exterior pressure to the core of earth within such proposed wall, then erecting within the trench a wall, then substituting for the core of earth within such proposed wall suitable permanent braces to take the exterior pressure transmitted through the wall."

Not only is it true that Mr. Ewen did not express or describe his invention, as he now claims it, in his patent, but he never fully understood it for more than five years after the patent issued. Very soon after he obtained his patent he undertook a thorough campaign to introduce his method. He opened an office in Chicago to exploit the invention, employed engineers, draughtsmen, and an architect for the purpose, and kept the office open nearly a year. During this time he personally endeavored to induce architects and engineers to adopt the process, and circulars were sent out, and correspondence had with architects, builders, and engineers throughout the country. He tried to induce all the principal contractors, engineers, and architects engaged in similar work in Chicago to adopt his process. They all spoke highly of it, but doubted its patentability, and hesitated to try it on any building. So far from receiving a general acceptance, the contrary is shown by all the evidence. Mr. Ewen was a prominent builder, for years connected with one of the largest firms in Chicago, a most able and skillful engineer. Anything coming from him deserved and would receive respectful attention. Yet every one doubted the practical efficiency of his process, as he then understood it. As will be seen later, he did not emphasize the now important and vital point—the manipulation of the movable or floating lining. Speaking of a pamphlet circulated by him to show his method, Mr. Ewen says:

"This pamphlet contained a full description of my process, with many illustrations showing its application. * * * No one seemed to appreciate it or wished to apply it."

But there is not a word in the pamphlet which calls attention to the floating lining or manipulation of the braces, except a general conclusion that the method is safe "because the inner core of earth sustains the same pressure at all times during the progress of the work." This it might do with rigid braces, and without manipulation.

About the time the pamphlet was published Mr. Ewen wrote a descriptive article for a Chicago newspaper called "The Inland Architect and News Record." This was in February, 1903. Like the pamphlet, it does not mention the two vital features of the invention, although using the language above quoted.

Nor did counsel for complainant, in adducing evidence to show in-fringement by the construction of the basement of the Boston Store, in the prima facie case, call attention to these vital and important features. They put in evidence an article on the Boston Store taken from the Engineering Record, a Chicago publication, and also the testimony of Malcom Ewen. The article contains some slight sug-gestion, perhaps, of the flexible lining and manipulated brace, but not enough to enable a person to find them who did not know they were there. Nor does Malcom Ewen say anything about them in his tes-timony.

It would seem that if the flexible lining, and the constantly manipu-lated jackscrew, with their ability to sustain the varying lateral pres-sure, had been really invented by Mr. Ewen, it would have found ex-pression when he was trying to convince the most critical and prac-tical body of men in the world that he had a feasible process. Leaving in the center core was as old as the Tronquoy Tunnel. Building the superstructure before the cellar was equally old, and was extensively practiced on the Boston Subway; not just as Mr. Ewen does it, but without great variation. Indeed, it was more than five years after the patent issued that Mr. Ewen discovered, through his expert wit-ness Charles S. Burton, that he had really invented the floating lining. This discovery was made at the proper time to avoid the defense of anticipation. It was not until February 28, 1908, almost two years after the bill was filed, and after defendants had closed their case in defense, that these important and vital parts of the process were ever explained or applied.

At this stage of the case complainant called Mr. Charles S. Bur-ton, a patent expert. By him these so-called great conceptions of the inventor are for the first time fully set forth and elaborated. This performance is called by counsel "Burton's Reissue of the Ewen Patent," and a most able and ingenious specimen of "specifications and claims" it certainly is. He says that the floating and flexible linings, and the adjustably extensive braces, transmitting the pres-sure from the adjoining land from and to the center core both be-fore and after the wall is built, and up to the time the center braces take the place of the core, are the two vital features of the invention, and are to be employed by constant attention to the jackscrews, keep-ing them adjusted so as to hold the planks against the trench walls by following up any yielding which may be detected as the screws are tested in the process of constant inspection, so as to uninterrupt-edly maintain the status or condition of the surrounding territory in respect to its capacity for upholding the buildings so that no ini-tial disturbance can occur. He thinks these two vital features were clearly appreciated by Mr. Ewen, from the language above refer-red to. By a practical engineer, he says, this language would be taken to point to the capacity of the jackscrews by their adjustment to keep the pressure always on the lining planks, so as to transmit it fully without permitting any actual yielding or slipping of the trench wall back of the linings. The adjustable feature of the jacks would be of no importance, have no part in the function of sup-

port except as the changing character or condition of the earth gives occasion for using this feature. To put it in more concrete and less general terms, if water runs out between the lining planks, or the earth rises in one part of the trench, or on turning a screw it is found loose, the lateral pressure at these points has been lost or impaired, according to the witness, and must be restored and again carried through the jacks to the center core. It would seem that the enormous pressure of the adjoining buildings would "follow up" any loss of earth or flow of water behind or below any particular part of the lining, or any rising of the earth in the bottom of the trench; but the testimony seems to indicate that this may not happen at once, so that if the jacks are watched, and "turned up daily," the original lateral pressure may be approximately maintained during the sinking of the trenches, and absolutely preserved from the time the I-beams for the trench walls are in place; the trench at that time being practically sealed at its bottom and sides. Thus the earth core which sustained the lateral pressures before the building process commenced sustains them at every stage of the process, and until the floor beam structure takes its place, as indicated in the tenth claim.

Now, it is clear that these two vital features were dimly present to the mind of the inventor when he wrote the specifications, but his subsequent conduct shows that he never appreciated their importance, or considered them as vital or even important parts of his process, until Mr. Burton had testified, and it was necessary, in order to escape anticipation, to find them in the patent. The question is thus presented whether these vital and important things can be found in the specifications and from there read into the claims, so as to narrow the claims to avoid anticipation on the one side, and show infringement on the other. It is perfectly clear that the claims do not contain these features and, assuming that they are found in the description, the question is whether they may be read into the claims.

For some purposes, descriptive parts of a specification may be read into the claims. The statute, section 4888 (U. S. Comp. St. 1901, p. 3383), provides that applicants for a patent shall file a written description thereof, and of the manner and process of making, constructing, compounding, and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains to make, construct, compound, and use the same; and he shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery. For the purposes of sustaining a patent, as where a nonpatentable principle or function appears to be claimed, but the specification shows that the patent was sought for a machine, device, or process which is patentable, the specification may be read into the claim. Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 18 Sup. Ct. 707, 42 L. Ed. 1136. But where the purpose is to escape anticipation or establish infringement, this cannot be permitted. The following citations show this clearly:

"The developed and improved condition of the patent law leaves no excuse for ambiguous language or vague descriptions. The public should not be deprived of rights supposed to belong to it without being clearly told what it is that limits those rights. The genius of the inventor should not be restrained by vague and indefinite descriptions of claims in existing patents from the right of improving on that which has already been invented. It seems to us that nothing can be more fair, both to the patentee and to the public, than that the former should understand, and correctly describe, just what he has invented, and for what he claims a patent." Merrill v. Yeomans, 94 U. S. 573, 24 L. Ed. 235.

"As patents are procured ex parte, the public is not bound by them, but the patentees are, and the latter cannot show that their invention is broader than the terms of their claim; or, if broader, they must be held to have surrendered the surplus to the public." Keystone Bridge Co. v. Phoenix Iron Co., 95 U. S. 274, 24 L. Ed. 344.

"The courts should not enlarge by construction the claim the Patent Office has admitted, and the patentee has acquiesced in, beyond the fair interpretation of its terms." Burns v. Myer, 100 U. S. 671, 25 L. Ed. 738; Lehigh Valley Railroad Co. v. Mellon, 104 U. S. 112, 26 L. Ed. 639; White v. Dunbar, 119 U. S. 47, 7 Sup. Ct. 72, 30 L. Ed. 303; Howe Machine Co. v. National Needle Co., 134 U. S. 388, 10 Sup. Ct. 570, 33 L. Ed. 963.

"We know of no principle of law which would authorize us to read into a claim an element which is not present for the purpose of making out a case of novelty or infringement." McCarty v. Lehigh Valley R. Co., 160 U. S. 110, 16 Sup. Ct. 240, 40 L. Ed. 358.

"A claim cannot be narrowed by construction, and thus rendered more likely to be infringed." Shepard v. Carrigan, 116 U. S. 593, 6 Sup. Ct. 493, 29 L. Ed. 723; McClain v. Ortmayer, 141 U. S. 419, 12 Sup. Ct. 76, 35 L. Ed. 800.

"A feature of a process not covered by the claims, but merely recommended in the specifications, instead of being required, or stated to be an essential part of the process, cannot be read into the claims." Sewell v. Jones, 91 U. S. 171, 23 L. Ed. 275; Holliday v. Pickhardt (C. C.) 29 Fed. 858.

In the Wilson v. McCormick Co. Case, 92 Fed. 167, 34 C. C. A. 280, the Court of Appeals for this circuit decided that an element not named in a claim cannot be read into it, citing (page 174 of 92 Fed., page 287 of 34 C. C. A.) McCarty v. Railroad Co., 160 U. S. 110–116, 16 Sup. Ct. 240, 242, 40 L. Ed. 358, where the court says:

"There is no suggestion in either of these claims that the ends of the bolster rest upon springs in the side trusses, although they are so described in the specification and exhibited in the drawings. It is suggested, however, that this feature may be read into the claims for the purpose of sustaining the patent. While this may be done with a view of showing the connection in which a device is used, and proving that it is an operative device, we know of no principle of law which would authorize us to read into a claim an element which is not present, for the purpose of making out a case of novelty or infringement. The difficulty is that if we once begin to include elements not mentioned in the claim in order to limit such claim and avoid a defense of anticipation, we should never know where to stop. If, for example, a prior device were produced, exhibiting the combination of these claims plus the springs, the patentee might insist upon reading some other element into the claims, such, for instance, as the side frames and all the other operative portions of the mechanism constituting the car truck, to prove that the prior device was not an anticipation. It might also require us to read into the fourth claim the flanges and pillars described in the third. This doctrine is too obviously untenable to require argument."

On his claims, therefore, the patentee must stand. Confined to them, he has discovered nothing new. If we might aid them by referring to the description, it might be possible by a liberal construction to

find there the invention now claimed which Mr. Ewen has thus dedicated to the public, and which is now being used to its great advantage. In the specifications of the Cook County Building, recently erected, the defendants Holabird and Roche required that the contractor should maintain a gang of experienced house raisers to keep the screws turned up daily during the digging of the trenches, setting of steel, and refilling with concrete. And there is some proof that the complete process was employed in two or three other buildings. Holabird and Roche do not admit that they used the Ewen process, although I think they did; but the matter is immaterial in view of the conclusion reached.

If the use of the flexible lining and manipulated jackscrew was so inherent in the process described by Mr. Ewen in his claims that the process could not be performed without them, or if skilled workmen everywhere had uniformly found in the practice of the patented process the two vital features in question, it is possible that the charge of anticipation might be avoided. American Fiber-Chamois Co. v. Williamson (C. C.) 69 Fed. 247; Id., 72 Fed. 508, 18 C. C. A. 669; Goodyear Tire & Rubber Co. v. Rubber Tire Wheel Co., 116 Fed. 363, 53 C. C. A. 583; Consolidated Rubber Tire Wheel Co. v. Finley Rubber Tire Co. (C. C.) 116 Fed. 629. But it is obvious that neither of these principles is applicable, since the claims do not mention adjustable nor extensible braces, and as the patented process has not been fully accepted, recognized, practiced, or used.

The conclusions reached, that the patent is invalid for anticipation, renders it unnecessary to consider whether the process as Ewen now claims it was used in the buildings, referred to in the testimony, constructed prior to his patent. I do not think it was used in any of such buildings, including the Tribune Building.

A decree will be entered dismissing the bill, with costs.