OVERWEIGHT COUNTERBALANCE ELEVATOR CO. v. HENRY VOGT MACH. CO.

(Circuit Court of Appeals, Sixth Circuit. May 8, 1900.)

No. 770.

**1. PATENTS—INVENTION.**

There is no invention in merely selecting and putting together the most desirable parts of different machines in the same art, making a new machine, in which each part operates in the same way as it did in the old, and effects the same result.

**2. SAME—ANTICIPATION—FREIGHT AND PASSENGER ELEVATORS.**

The Hinkle patent, No. 257,943, for an improvement in freight and passenger elevators, is void for anticipation.

Appeal from the Circuit Court of the United States for the West-ern Division of the Southern District of Ohio.

This is a suit in equity brought originally against Kate P. Leaman for the alleged infringement of letters patent No. 257,943, for an improvement in freight and passenger elevators, issued to Philip Hinkle, May 16, 1882, upon an application filed September 27, 1881, assigned to O. M. Weymann, March 1, 1897, and by him assigned, on the 17th day of the same month, to the com-plainant, the Overweight Counterbalance Elevator Company. The infringe-ment complained of consisted of the alleged use of the invention in an ele-vator used by the original defendant in the "Lancaster Building" at Cin-cinnati. After the filing of the bill, and before appearance by the above-named defendant, the Henry Vogt Machine Company, a Louisville corporation, which had manufactured and put up the said elevator in the Lancaster Building, was by the agreement of counsel for all the parties substituted in place of the original defendant, and thereafter the proceedings went on un-der the title of the suit thus constituted. The bill contained the allegations usual in such bills, and prayed for an injunction, and for a recovery of profits and damages. In addition to this, the bill alleged that the complainant had previously brought suit on the same patent in the circuit court of the United States for the Northern district of California against one Mark Sheldon, a purchaser and user of a machine of identical construction with that here complained of, from the Sulzer-Vogt Machine Company, under which name the Henry Vogt Machine Company was formerly incorporated; that the Sulzer-Vogt Machine Company assumed the defense of the suit, and contested it, in a trial before the court and a jury; and that a verdict and judgment were entered in favor of the plaintiff. The answer denied that Hinkle was the first inventor of the supposed improvements described in the patent, and set up various anticipations by earlier patents, and various prior uses by sev-eral different persons, at places which were specified. Infringement was also denied. The answer further averred that the defendant had no knowl-edge, except as it was informed, of the suit in California, mentioned in the bill, but that it was informed and believed that such a suit had been brought by the plaintiff against Sheldon; that it was determined without a trial of the merits of the controversy, and judgment entered for the plaintiff by consent of the defendant therein; that the Sulzer-Vogt Machine Company did not assume the defense of that suit; and that Sheldon, the defendant, refused to permit the case to be appealed. The complainant filed a replication to the answer, and proofs were taken by the respective parties. The patent in suit contained two claims, both of which were alleged to have been infringed. The first consisted of a combination in an elevator of a hoisting drum, a cage with a rope supporting it attached to one side of the drum, and an over-balance weight, with a rope supporting it attached to the other side of the drum. The second consisted of the same elements, and a worm wheel mount-ed on the same shaft as the drum, and a worm meshing with it mounted on a shaft transverse to that of the drum. These claims are more fully ex-plained in the opinion which follows. The case having been brought to a hearing, it was held by the circuit court that the first claim of the patent was void by reason of anticipation by former patents; that it was unneces-sary to determine the validity of the second claim, for the reason that in the opinion of the court it was not infringed by the use of the elevator com-plained of. It resulted that the bill was dismissed. The complainant ap-peals from the decree. Further facts are stated in the opinion.

Charles M. Peck, for appellant.

Edwin H. Brown and Arthur Stem, for appellee.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

SEVERENS, Circuit Judge, having stated the nature of the case as above, delivered the opinion of the court.

The Hinkle patent, on which this suit is founded, relates to the construction of elevators used for carrying passengers and freight

in a cage or upon a platform moving up and down through a shaft adapted to the purpose. Many different styles of apparatus had been employed prior to his application, based upon the same general ideas, and some of them having such close resemblance to his own as to make it necessary to institute a sharp comparison in order to ascertain what, if any, advance in the nature of invention he made over the prior condition of the art. He gives the following statement of what he regarded as the characteristics of his invention:

"My invention has reference to an arrangement for re-enforcing the lifting power of any given freight or passenger elevator without increasing the working power of the engine or motor that drives it; and it consists in the application of an overbalance counterweight for overbalancing the weight of the cage, and in the interposition between said counterweight and the cage of a self-acting brake, which prevents the superior weight of the counterbalance from being transmitted to the cage and engine power when the engine and cage are standing at rest. The self-acting brake which I use is a worm wheel and worm, which also serves as a gearing for transmitting the power of the engine or motor to the cage and counterweight."

The following Figs. 1 and 2 illustrate his construction:

Fig. 1   Fig. 2.

Referring to the figures illustrated, he says:

"Let A represent the cage, which is suspended in the usual way from the hoisting drum, B, by means of the rope, C, which passes up over pulleys, dd, as shown. A rope, E, is also secured to the opposite side of the drum, B, and passes up over a pulley, f, and to the opposite end of this rope the counterweight, G, is suspended. The drum, B, is secured upon a horizontal shaft, h, which is properly supported in bearings, and to this shaft is also secured a worm wheel, I. A transverse worm or screw shaft, J, is mounted in bearings, either below or above the worm wheel, at right angles to the shaft, h, so as to engage with the worm wheel, I, and to this shaft the power of the engine or other motor employed is applied. It will now be seen that this worm wheel and worm serve two purposes—First, as a gearing for transmitting the motion and power from the shaft, J, to the shaft, h, and drum, B; and, secondly, as a self-acting brake, which acts instantly when the rotation of the worm shaft ceases, and prevents the superior weight of the counterweight from reacting against the weight of the cage, so that both will remain at whatever position they are in when the rotation of the worm shaft ceases."

Then he goes on to describe how this construction can be utilized, and the advantage of it, as follows:

"I can now make the counterweight, G, as much heavier than the cage as I wish, and its overweight will assist in raising the loaded cage, while the power of the engine or motor is only required to overcome the difference in resistance between the weight of the cage and counterweight. When the empty cage is lowered again, the power of the engine is still required to overcome the superior weight of the counterweight on the opposite side, thus producing a uniform strain upon the engine without overstraining it. Suppose, for instance, that the cage weighs two hundred pounds, and suppose that the counterweight weighs four hundred pounds, and suppose that the worm can bear with safety a load of two hundred pounds, I can then raise four hundred pounds in the cage, besides the weight of the cage itself, and the engine will have only two hundred pounds to lift when the cage is raised, and the same amount when the cage is lowered, and the worm gears will at no time be subjected to a strain of more than two hundred pounds; whereas, with a simple balance weight. such as has heretofore been used, no more than the weight of the cage could be used as a counterbalance without having it react to lift the cage as soon as the application of the power to the driving shaft ceased. In this latter case I would be able to raise a weight of only two hundred pounds on the cage. It is therefore evident that I am able, by raising my overbalance counterweight, to raise twice the amount of weight on a certain size machine as heretofore; or, in other words, it enables me to do the same amount of work with an engine of half the capacity as has been heretofore required."

And he adds:

"In case it is desired to raise a load of more than ordinary weight, additional weight can be applied to the overbalance to any desired extent within the limits of strength of the rope and mechanism."

His claims are these:

"(1) In an elevator, the combination, with the hoisting drum, B, of the cage, A, and rope, C, thereof attached to one side of the drum, B, and the overbalance weight, G, and rope, E, thereof attached to the opposite side of the drum, B, substantially as set forth. (2) The combination, with the drum, B, and ropes, C and E, attached to the opposite sides thereof, and suspending the cage and overbalance weight, respectively, of the power shaft, J, provided with the worm, as described, and the worm wheel, I, mounted on the same shaft with B, as set forth."

From this it appears that the features which he contemplated as new were the overweighting of the counterbalance, and the em-

ployment of the worm gear to lock fast the elevator whenever the motive power applied to the worm shaft should be suspended.

With regard to the overweighting of the counterbalance, the inventor nowhere states the extent to which he proposes the overweighting shall go, except as he shows by an illustration what, by his method, a certain proportion of overweighting will accomplish. He says it may be increased as one wishes. It is left to the judgment of the user. Counsel for the appellee contend with much force that this lack of definiteness leaves the user to the necessity of experimenting to find out how the apparatus must be constructed and arranged in order to realize the contemplated advantage, and that the statutory requirement (Rev. St. § 4888) in this regard is not fulfilled; citing Howard v. Stove Works, 150 U. S. 167, 14 Sup. Ct. 68, 37 L. Ed. 1039; In re Incandescent Lamp Patent, 159 U. S. 465, 16 Sup. Ct. 75, 40 L. Ed. 221, and the cases cited by Mr. Justice Brown in delivering the opinion of the court in the latter case. It is clear that the only escape from this criticism is to construe the patent broadly enough to cover any appreciable overweight beyond a mere balance, and possibly enough more to overcome the friction of the elevating apparatus. Perhaps, if that would save the patent, we might be authorized to adopt that construction upon the principle recognized by this court in Soehner v. Range Co., 54 U. S. App. 389, 28 C. C. A. 317, 84 Fed. 182. But, as we think that for other and more certain reasons the patent cannot be sustained, we pass the question suggested without deciding it.

It is shown by the evidence that several patents had been issued in this country a considerable time prior to Hinkle's supposed invention, for elevators and improvements therein, in some of which the motive power was communicated through worm gearing, having so slight a pitch in some cases as to operate as a deadlock when the movement of the machinery should be suspended, and in which also the counterbalance (a thing used in all of them) was so overweighted as to help in moving the load on the platform or cage, in both these respects performing the same functions as Hinkle points out to be the peculiar characteristics of his own, and in the same way. It is to be noted, however, that no express mention of the worm gear being so pitched as to operate as a deadlock was made in the description of the invention in such former patents. Others show the presence of one of the above-mentioned characteristics without the other. But this last-mentioned circumstance is not material. These parts of the machine are so far separated and out of relation to each other that it would require only the commonest kind of skill to borrow from one well-known style of elevator a part of the operating machinery and put it into another elevator, to there perform the same function that it did in the first. There is no invention in merely selecting and putting together the most desirable parts of different machines in the same art, where each operates in the same way in the new machine as it did in the old, and effects the same result. No principle of the patent law stands on plainer reasons than this. A somewhat leading case on this subject is Hailes v. Van Wormer, 20 Wall. 358, 22 L. Ed. 241, and the

principle is illustrated by the decisions of this court in the following cases: Manufacturing Co. v. Robbins, 43 U. S. App. 391, 21 C. C. A. 198, 75 Fed. 17; Stearns v. Russell, 54 U. S. App. 591, 29 C. C. A. 121, 85 Fed. 218; Campbell Printing-Press & Mfg. Co. v. Duplex Printing-Press Co. (decided at this term) 101 Fed. 282.

It is, of course, conceded that when the assembled old elements effect a new mode of operation, producing a more beneficial result, this rule does not hold. In such case a deeper insight leading to the perception of new results from new co-ordinations of old elements may be exercised in a degree amounting to invention. The distinction is clear, though it may happen, as it constantly does in the application of other principles, that difficulty may be found in cases which hover along the line between the mere assembling of old elements and the putting them into such relations that, co-acting, they have a different and more beneficial mode of operation.

Counsel for the appellant contends that claim 1 of the Hinkle patent, when properly construed, is co-extensive with claim 2, because he says the parts of claim 2 omitted in claim 1 are included by implication. We should have some difficulty in agreeing to this conclusion; but we do not think it important to settle the question, because, if the counsel is right, the benefit of the patent is fully protected by claim 2.

Referring, now, to the prior patents shown in the record, we notice, first, the reissued patent No. 4,270 to Otis, of February 21, 1871. This patent was for an improved hoisting apparatus, and the patentee says that his "improvement consists in the combination of a counterpoise with the hoisting platform or cab through the intervention of the hoisting drum, whereby a counterpoise of as great a weight as, or of a greater weight than, the platform or cab is permitted to be used." The ropes carrying the platform and the counterpoise, respectively, were attached to the drum so as to wind thereon in opposite directions. Thus, when the drum was turned one way, the platform would be raised and the counterpoise lowered, and vice versa when the drum was turned the other way. The patentee says of this construction, that "it affords the advantage of enabling a counterpoise of greater weight than the platform to be used, so that not only can the platform or cab, but the load upon it, or a portion of such load, be counterbalanced." He also refers to a "brake or stop mechanism used in connection with the hoisting drum," but does not specify what kind of a brake.

It is clear that his construction was an anticipation of so much of Hinkle's patent as relates to the hoisting apparatus, as distinguished from that part of his elevator in which the worm gear is located. If, at the time when Otis made his application, no brake in connection with the hoisting drum had ever been used, his patent might have been available to cover a brake of the kind employed by Hinkle. Or, if worm gearing had been previously used for that purpose, it would come within the suggestion of the Otis patent that such a brake would fulfill his requirements

Another patent was that to Reedy, No. 160,469, of March 2, 1895. This patent shows the same general arrangement of a cage or plat-

form, a counterpoise, a hoisting drum, with ropes running from opposite sides thereof to the platform and counterpoise, except that Reedy, instead of fastening the ends of the two ropes to the sides of the drum (called a sheave in the patent, but in reality a short drum), wound a rope around the drum once or twice, and extended the ends to the platform and counterpoise, respectively, by which arrangement the rope was held to the drum by friction. The counterbalance is not shown to have been overweighted, or that anything more than a mere balancing was intended. But it contained the worm gear that Hinkle afterwards adopted, intended and constructed for the same purposes, namely, to operate the hoisting apparatus, and also to serve as a deadlock when the former should be brought to a standstill; for the patentee says, in stating the nature of his invention, that the hoist is driven by worm gearing, which constitutes "a reliable lock to hold the hoisting mechanism in any position in which it may be in stopping it." Hinkle, therefore, found his hoisting mechanism in the Otis patent, and the worm gear for driving it and to serve as a deadlock in the Reedy patent.

But in the Andrews patent. No. 185,276, of December 12, 1876, are found both of the elements which Hinkle relies upon as the distinguishing features of his invention, unless it be that the pitch of the worm gear is not stated; that is to say, his hoisting apparatus, with an overweighted counterbalance, and his worm gear to drive it. In one of the forms of his hoisting apparatus he uses a drum having V-shaped grooves around it, in which the rope supporting the platform at one end, and the counterbalance at the other, is wound and held by friction, upon the principle employed in Reedy's patent. In another form he says that the ropes may "be attached to the drum, and to the platform and its counterbalance, respectively," so that they shall "have equal movements in opposite directions." Andrews uses two sets of rope for the purpose of safety, but this is a mere duplication, and in no wise affects the principle or mode of operation. Then he says he uses a counterpoise "for the purpose of balancing the car and its load to a greater or less extent." In his specifications he does not state the mechanism by which his elevator is to be driven, doubtless for the reason that it was not new, and he was aware he could make no claim for novelty in it. But his diagrams show that it was intended to be driven by worm gear, as such mechanism is distinctly shown. Whether it had such a pitch as to make a deadlock when the elevator was at rest is not clearly indicated, but it is shown that it is a principle in mechanics that worm gear in any ordinary form of construction, while it may operate freely in its direct or forward movement from power applied to the worm shaft, offers serious resistance to reverse motion from power applied to the worm-wheel shaft; and when the pitch of the worm and of the teeth of the worm wheel is less than six degrees, and is at rest, it is immovable by power applied to the worm-wheel shaft. It is therefore a question of form whether the pitch shall be made above or below the degree at which it will form a lock, and, if a mechanic constructing an elevator to be driven by worm gear were asked to put in something which would hold the elevator from falling

when it should be brought to rest, it would seem that his first thought would be to make the pitch of the gear slight enough for that purpose. However, as we have already shown, the problem, if such it was, had already been worked out, and a gear of the requisite form and for the purpose had for some time been in use. Several well-authenticated prior uses of elevators of similar construction to those of the patents last mentioned, and to that of the patent in suit, are shown by the proofs, some of them having most of the features of the Hinkle patent, and some of them having all. We shall not take space to describe each. One of them was installed in the Equitable Building in New York in 1870, and continued in use for many years. It is shown by the testimony of men who put it in, by the original engineer who operated it, and by his successor and others familiar with it, that it contained a counterbalance overweighted at times as much as 1,000 pounds, and at others in different degrees, according to the requirements. It was driven by worm gear, having, as we infer, a pitch of about one-half of that at which the gear would lock, and was therefore ample to accomplish the purpose. It appears to have been the sole reliance for arresting the reverse movement of the elevator when the forward movement of the machinery should be suspended. It would seem that this elevator embodied all the features for which novelty is claimed in the Hinkle patent, as well as all the elements in the combination claimed. There were other subsidiary features, but the dominant characteristics were the same as those of the patent in suit.

The bill of complaint charges that in a former suit brought by the complainant in the circuit court for the Northern district of California against Mark Sheldon, of which it is alleged the predecessor of the defendant herein, and with whom it is in privity, took charge and assumed the defense, the validity of the Hinkle patent was found and determined by the verdict of a jury and the judgment of the court. In the answer of defendant it is denied that the defendant, or its predecessor, participated in the proceedings in that case, and it is claimed that for that and other reasons the judgment therein cannot be used as an estoppel. It is not proven that the defendant herein, or its predecessor, did in fact assume the defense in such former suit, nor is any point now made of it by counsel for the appellant.

If we were to assume, as the court below did for the purpose of its decision, that the Hinkle patent was not anticipated by the former patents shown in the record, we should still think that its standing is on such narrow ground that the use complained of was no invasion of the rights secured thereby, agreeing in this respect with the view of the judge in the circuit court. The decree of the court below will therefore be affirmed.