Booth, Chief Justice,
delivered the opinion:
The plaintiff, Emil J. Simon, was on January 8, 1918, granted Letters Patent No. 1253103 for an invention in spark gaps for the production of powerful electrical oscillations. This suit is for an alleged infringement of the patent by the Government, brought under the act of June 25, 1910 (36 Stat. 851), as amended by the act of July 1, 1918 (40 Stat. 705).
To understand the natiire of the mechanical device for which novelty and utility are claimed reference must be made to the electrical circuits generally employed at the time of the advent of plaintiff’s patent, and the place it assumed in the art of transmitting radio telegraphy. It was and is well known that radio messages are transmitted into space from an antenna wire in which a high voltage current is made to oscillate. The current utilized for this purpose is not transmitted to the antenna wire directly, but is generated and set up in a separate circuit which is coupled with the antenna circuit. The art had devised a conventional apparatus for generating and radiating powerful electrical oscillations; it embraced the essential features of electrical circuits and provided for a gap or opening through which, when the generating circuit attained a sufficiently high,voltage, the electric current would pass; or, as said, jump in the form of a spark, and set up the necessary oscillations in the antenna circuit.
Plaintiff’s patent concerns alone a mechanical means related solely to a spark device. What we have endeavored to explain is illustrated by Fig. 1 of plaintiff’s patent, as follows:

The letter E indicates the generator or source of current. The generator circuit is coupled through the transformer P S. The terminals of the secondary of the transformer *8 are bridged by a circuit connection containing a condenser C, in the usual manner. The spark gap is identified by the letter G, and its individual units by the letters Gi, G2, Gs, G4, Gs. Included in series with the spark gap device are the inductive coupling members L, and L2, the latter being arranged in the circuit of an antenna earth system O, B.
The record furnishes the information that the first spark gap device introduced in the art was the work and conception of a German scientist, Hertz. In a powerful electrical circuit Hertz inserted “ a pair of metallic balls or knobs separated by an air gap of a small fraction of an inch, each ball being connected to opposing portions of the electrical circuit.” Hertz’s device, while serving to some extent and under some circumstances to send out oscillations of desired single frequency, encountered the fatal obstacles of the alteration of air currents between the balls and the generation of excessive heat, with the result that the gap itself became an efficient conductor of electricity, and when the voltage of the circuit varied from a high to a lower one waves of different frequency resulted. Hertz’s failure to conceive a hermetically sealed device, as well as other defects, rendered his conception of little value in many respects, and its use ineffectual in that the waves transmitted into space from the antenna lacked the necessary uniformity in frequency to enable those tuned to it to receive connected and uninterrupted communications. Other difficulties aside from the above ones attended the effort of Hertz. To them, however, we need not refer, for as we have said, the Hertz device, which was not patented, disclosed the possibilities of a spark gap without accomplishing the elimination of the disturbing functional elements incident to a successful spark gap oscillating circuit.
On February 20, 1911, Georg Graf Arco and Eagnar Hákan Eendahl, residents of Berlin, Germany, were granted Letters Patent No. 1216588 for “ Improved Means for Producing Electrical Oscillations,” and the means specified was an improved spark gap or, as said therein, “ such short gaps are called in the art £ quenched ’ spark gaps, for the reason that the spark is quenched very rapidly therein.” The inventors clearly appreciated the difficulties of a single- *9 spark gap, exposed to the air and subjected to excessive beat, for tbe specifications disclose in Figs. 1, 2, and 3 an individual or single spark gap. Fig. 3 shows all the essential elements of an individual quenched spark gap unit comprising two parallel plates or electrodes, the spacing washer, and the clamp screw. Fig. Y is described on page 2 of the specifications, line 100, as follows:
“ Fig. Y shows such a connection in which three spark gaps of the form shown in Fig. 3 are shown connected in series.”
In other words, the Arco patent discloses to the public the use of what may be properly termed three-unit spark gaps in series. The Arco patent is so clearly an anticipation that we reproduce the figures cited in the above discussion.

Claim 4 of the patent in suit reads as follows:
“ 4. A self-contained individually removable spark gap unit, comprising a plurality of electrodes assembled together with opposing faces offset from each other, a packing of insulating and air-excluding material between parts of said electrodes and inclosing the opposing sparking faces thereof, and insulated screw pressure securing devices passing through said electrodes to hold the same and said packing under pressure in assembled relation independently of any other unit.”
This claim is slightly more limited than claims 1, 2, and 3 of plaintiff’s patent. The device embraced within it, over previous claims, concerns, we think, its call for “screw pressure securing devices passing through said electrodes to hold the same and said packing under pressure in assembled relation independently of any other unit.” In other words, the claim specifies the location of the pressure or clamping screw which functions as specified.
*10 A patent granted to George Seibt, No. 1216615, on February 20, 1917, discloses the essential elements of claim 4 in the following illustration, taken therefrom:

Beyond doubt, Seibt shows a multiple spark gap of the quenched type with a centrally located screw. The patentee, Seibt, in disclosing the elements of Fig. 14 recites:
“ Fig. 14 shows a plurality of disks 34, superposed upon but separated from each other by insulating washers 35, the disks being held between two clamp heads 36, 37, with heavy insulation 38 interposed between the clamp heads and outer disks, said heads being held together by a central rod 39, passing centrally through the disks but insulated therefrom by the insulating sleeve 40.” (Italics inserted.)
Seemingly, little if any novelty may be attached to the means for exerting pressure and sustaining the electrodes in proper relationship in view of the prior art. Seibt attempted by express declaration to avoid any limitations of his device in this respect, and it is difficult to ascribe invention to a specification of this character, one which would suggest itself to anyone at all familiar with the art.
The plaintiff’s patent is illustrated by Figures 2 and 3, which we insert at this point.

*11

The prior art, we think, positively discloses that in the quenched gap the electrode surfaces are flat and absolutely parallel, with a very small distance between them, this distance being an approximate space of eight to fifteen thousandths of an inch, and the air is excluded from these sparking surfaces so as to prevent oxidation. A spacing washer or gasket of nonconducting material of proper thickness has the dual function of maintaining the properly spaced parallel relationship between the electrodes and the exclusion of air, the assembly being clamped together so as to be held in rigid fixed relationship. One pair or set of electrodes was soon found to be insufficient to create powerful enough oscillations for practical purposes, and in actual practice about twelve to sixteen of such gaps are utilized, the same being connected in electrical series. This was and is usually done by stacking the electrodes together with their gaskets in proper positions in a pile and placing the entire assembly under pressure by a screw-clamping mech *12 anism or device. All this, we think, the very able brief of plaintiff’s counsel concedes. What the plaintiff now claims as invention arises from .the fact that in such a multiple gap arrangement the individual gaps frequently become inoperative, due to leakage of air and disintegration of the sparking surfaces, or to the fact that small particles of metal are displaced from the sparking surfaces and short-circuit the narrow gap. Obviously, when several of the gaps thus become inoperative it is necessary to disassemble the entire stack or pile of gaps to remove those that need cleaning and after cleaning to reassemble the entire gap, and to “ season ” the same by passing a high voltage discharge through the gap for a certain period before the same is again in use. This proceeding undoubtedly involves a considerable period of time, and in addition necessitates the use of a spare multiple gap to be placed in the transmitting circuit and utilized during the cleaning process described in order to minimize the interruption of the service due to the causes enumerated. Toward the correction of this obvious disadvantage in existing gaps the plaintiff’s patent is directed, and to overcome, or to at least minimize to the greatest extent the impediment of delay, the plaintiff discloses a construction in which the total gap structure is divided into a number of units, each assembled with proper gaskets and clamping mechanism. This we think is clear from the specifications and claims of the patent, demonstrated by reference to the figures employed as illustrative. In Fig. 2 the numeral 2 designates an intermediate plate, “ with a seat or recess 4, * * * into which is inserted an electrode member 5. * * * This electrode member 5 is secured in its seat in the face of the plate 2 in any suitable or convenient manner. * * *
“Associated with the disk or member 2, is a cooperating member or disk, or plate, * * * designated by the numeral 1. The opposed surface or side face of the member 1 is similarly provided with a seat or recess 6 therein in which is similarly seated and secured a cooperating electrode member 7. The opposed surfaces of the electrode members or inserts, 5, 7, fixed or seated in the recesses 4, 6, of the opposed faces of the plates or disks, 1, 2, are preferably separated from each other a suitable and convenient distance apart. This separation is accomplished, *13 or may be accomplished, in any suitable or convenient manner. I have shown a simple arrangement wherein raised bosses or rims 8, are formed in the opposed faces or surfaces of the plate members 1, 2 and preferably in the form of raised annuli surrounding the electrode plates 5, 7, therein and which surfaces 8, are arranged to be brought into contact or bearing relation with interposed packing when the plates are assembled. It is exceedingly important, and in fact necessary, that the air gap space between the opposed faces of the electrode members 5, 7, be maintained absolutely air tight and the individual members composing the unit electrically insulated from each other. This may be accomplished in many specifically different ways. I have shown a suitable arrangement for accomplishing these purposes wherein I have interposed between the bearing surfaces of the raised annuli 8, of the plates 1, 2, a suitable air-tight insulating material which I have indicated at 9 in the drawing. This may be of any suitable material capable of maintaining the joints between the raised surfaces 8 of the assembled plates perfectly air-tight and electrically insulated.
“ In the form shown the plate 2, is provided with seats or recesses in both the faces thereof and an additional or third plate 3, is associated with the other side thereof from the plate 1. Where three plates constitute or compose the unit of the gap device, the outermost plates are provided with seats or recesses 6 and inserted electrode plates 7, only on their inner faces, while, the intermediate plate 2 is provided with seats or recesses 4 and inserted plates 5, on both faces thereof. Where three plates are employed for the unit the intermediate plate is separated in like manner as above described from both of the outermost plates by interposed raised bosses 8 and an interposed air-tight and insulating packing.
“ While I have mentioned the fact that two or three plates assembled together constitute a unit of the gap structure, it is to be understood that my invention is not to be limited or restricted in this respect as a larger number of plates may also be assembled together to form the unit of the gap device.
“In accordance with the essential characteristics of my invention the complete spark gap is composed of a plurality of the units such as above described. It is also an essential characteristic of my invention that each unit is self-contained. That is to say, a unit is composed of two or more plates which are held together as a unit under sufficient degree of pressure to insure absolute air-tightness between the spark gap space therebetween.
*14 “A spark gap structure embodying my invention possesses the advantage of easy access to units for the removal, repair or replacement thereof or of the individual elements composing the units, and that the individual elements composing a unit are held together under pressure in the self-contained unit itself and the degree of pressure imposed on the elements is not dependent on the pressure under which the various units are held together.”
By thus utilizing a series of individual units, each unit having its own clamping arrangement, it then becomes possible, upon the breakdown of an individual gap or unit, to readily remove the same from the remainder of the units and to substitute a spare unit without more than a moment’s delay. The plaintiff relies upon claims 1, 2, 3, 4, and 7 of his patent. Claims 1,2, and 3 differ but slightly from each other in phraseology and this group will be considered first, claim 3 being typical of this group. Claim 3 reads as follows:
“ 3. A spark gap device for the production of powerful oscillations, comprising a plurality of self-contained individually removable units, each unit comprising a plurality of disk-shaped electrodes held together with their sparking faces separated by an air-tight spark gap space by annular spacing packing of insulating and air-tight material and by clamping means forming part of the unit structure and serving to hold said electrodes in adjusted position whether assembled as part of the spark gap device or removed therefrom, such means being independent of the other units and of the spark gap device as a whole.”
There can exist no doubt but that the terminology of claims 1, 2, and 3 are readable upon the structure made and used by the defendant. Nor is there any room to question the fact that the division of the multiple quenched spark gap of the defendant into individually and separately removable units possesses the advantages of quick replacement mentioned in the plaintiff’s patent. The serious issue, the one upon which, in our opinion,- the case turns, goes directly to the validity of plaintiff’s patent, and is to be resolved upon whether what the plaintiff discloses involves more than mechanical skill. It is to be observed that the patentee does not limit the division of that which was formerly integral into any specified number of units. In fact, he purposely *15 refrains from doing this. This is clearly established by a portion of the specifications heretofore quoted. Therefore, it is, we think, clearly deducible from, and independent of, the state of the art that all that plaintiff accomplishes is to avail himself of existing spark gaps and by a process of combination, old in the art, segregate separate units into a single multiple unit, made up of such members as convenience suggests, which because of the combination may be quickly inserted into a spark gap at the point where a unit or units have ceased to function properly. By dividing into units a multiple spark gap the functioning of the old device is in no way improved. No departure from prior conceptions as to the ultimate and vital qualities of a spark gap appears. What the plaintiff conceived was a convenient means for repairing in accelerated fashion a damaged spark gap, whereas the old method of repair and substitution exacted a longer period of time. It is, we think, similar in purpose to carrying a spare wheel to an automobile as a substitute in the event of a deflated tire upon one then in use.
It has become well settled that there is no invention involved by merely making in two parts what was formerly made in one where no new function or different result is obtained. In Stetson et al. v. Herreshoff Mfg. Co. (113 Fed. 952) is found a case closely analogous to the present one before this court. That case related to the backbone or keelson of a ship, and in order to facilitate handling, the patentee devised a keelson cast in three pieces instead of the integral keelson of the prior art. The court said in connection therewith (p. 956) :
“ The only novelty shown on the complainants’ theory of their patent is the division of an old device into three pieces, because it was impracticable to make or handle castings, such as those shown in the prior patent, of sufficient size for use in larger vessels. The compound feature of the construction is merely a weakness conceded to the exigencies of construction. The function of the compound structure is exactly that of the simple structure.
“ I am of the opinion that it was not invention to think of using three castings instead of one, and that to make the castings of such form that their ends could be bolted together was a mere mechanical change, involving no exercise *16 of the inventive faculty, and tbe scantiest exercise of mechanical skill.”
In Victor Talhing Machine Co. v. Hawthorne <& Sheble Mfg. Co. (168 Fed. 554), the patent involved the making of a talking-machine horn in two parts so that it might be dissembled for shipping purposes. The court said, in connection therewith (p. 555) :
“ It is true that the improvement covered by the patent in suit (No. 832896) is prima facie novel. The grant of letters carries with it such a presumption; but the presumption must give way if the court is clearly convinced, from examining the improvement, that the element of invention does not appear. In my opinion, such a situation is presented, as it seems to me no invention is disclosed by the device in question. What the patentee did was simply to take the old amplifying horn of a talking machine, cut it in two for reasons of convenience, and provide well-known means for refastening the parts when the occasion to operate the machine should arise. * * *
“As thus stated, all this is ‘ evident,’ and I think that the device of the patent by which these inconveniences are avoided is evident also, and did not call for the exercise of the inventive faculty, but merely for such skill as a capable artisan is not likely to lack.”
In Bulloch Electric Mfg. Co. v. General Electric Co. (149 Fed. 409), the court has attempted to define the line of demarcation between mechanical ingenuity and invention, and the court states, with respect to the man skilled in the art (p. 420) :
“ The skill of the trained workman will develop the idea of the inventor in more refined, more delicate, and more exactly suitable forms than the original. He may cut away needless bulk, he may increase the size of parts, he may make them stronger, if need be, by the substitution of one familiar material for another, make them lighter or heavier, he may divide one fart into two, or combine two in one, or make any other transformation of details, so long as he is pursuing and working out the original discovery or invention by the exercise of the insight, good judgment, and expertness which he is expected to possess and apply.” (Italics inserted.)
Additional citations are available; they are but cumulative. The case tested by the prior art and established prece *17 dents in patent law falls, we think, within the class where the claimed originality goes only to the extent of the exercise of the skill of one whose knowledge of the art would suggest the device as a matter of convenience, a ready means of combining by well-known elements the single units of an oscillating circuit into a multiple unit to minimize without entirely eliminating the period of interruption due to the normal functioning of the old spark-gap circuit. To utilize existing units in the combination specified without in any way evolving a new and novel method in the functioning of the old device is, we think, no more than a mere segregation of the old device, by the employment of mechanical skill, into separate units of larger proportions and an increased number of old spark gaps.
As to claim 7 of the patent in suit, to which we have heretofore referred, we think that regardless of its validity or invalidity, the Government’s devices do not infringe. The Government’s gap provides spring clips for the distinct purpose and function of providing the connections between the various electrodes. When two machines are different, when they perform different functions, or the same function in a substantially different way, the necessary identity of operation is lacking, and the absence of infringement apparent, and, in addition, it is extremely doubtful whether the mere making of the outer surfaces of the electrodes flat would involve more than mechanical ingenuity, especially when this was practiced in the prior art in connection with the stacking of individual pairs of electrodes into an integral quenched gap structure.
For the reasons assigned, the plaintiff’s petition will be dismissed. It is so ordered.
Williams, Judge; LittletoN, Judge; and GeebN, Judge, concur.
Wi-ialey, Judge, did not hear this case and took no part in its decision.